## Vance et al. v. Atherton et al.

(Decided Nov. 17, 1936.)

CLAUDE E. SMITH and W. H. BARNES for appellants.

HEAVRIN & MARTIN for appellees.

OPINION OF THE COURT BY JUDGE RATLIFF—Affirming.

This is the second appeal of this case. The opinion in the former appeal may be found in 252 Ky. 591, 67 S. W. (2d) 968, and a reference to it is sufficient without repeating the history and facts of the case in this opinion.

Upon a return of the case to the circuit court, answers and other pleadings were filed and issue joined on the questions (1) whether the appellee L. C. Atherton performed his contract under the deed to maintain, support, and care for John B. Atherton and Della Atherton, who were the parents of appellant and appellee; and (2) if not, did appellant perform the duties required of appellee. The only question involved in this appeal is the sufficiency of the evidence on the issues indicated above.

The following facts are not in dispute:

At the time of the execution of the deed L. C. Atherton, appellee, lived on a small tract of land within a few hundred yards of his parents. In 1916 appellee's wife died, and then he moved into the house with his parents and lived there with them until March, 1917, when he moved back to the house where he had previously lived and remained there about one year. He then rented a farm about three miles away and moved to it and was living there when his father died in 1920, and soon thereafter, in the early part of 1921, he took his mother to his home and she continued to live with.

him until her death in 1929. It is conceded that appellee paid all doctor bills and burial expenses of both of his parents.

The facts in dispute relate to the services rendered the parents by appellant and by appellee. According to the evidence of appellant, a few months previous to the execution of the deed, John B. Atherton had a stroke of paralysis, and his mental and physical condition were very bad at the time of the execution of the deed until his death, and he needed constant personal attention; that his mental condition was such that he did not know that he was at his home and he would insist on going home. At times they would have to keep the doors barred and constantly watch him to keep him from leaving his home; his physical condition was such that he required extraordinary menial services, such as changing his clothes, bed linens, etc. She testified that appellee did visit their parents occasionally but did not give them but little, if any, personal care and attention, and that she stayed with them a large portion of her time and looked after them and performed such services as were necessary, and it was necessary for her to do so because of the enfeebled condition of her father, and that her mother was also old and feeble and unable to care for him. She said that after appellee moved to the farm he rented at Nuckles, Ky., in 1917, his boys, who were only about twelve and thirteen years of age, respectively, occasionally visited their grandparents at night but attended school and worked on the farm with their father during the day and did not render much service to their grandparents. She said that in March, 1920, at the request of her mother, she moved her parents to her home and kept them there until the death of her father in August, 1920. She further testified that during all this time, in addition to the personal care, attention, and menial services rendered her parents, she furnished them with groceries, clothing, and all necessities of life, and that appellee contributed very little, if anything, to their support. Two daughters of appellant and a son-in-law, and perhaps one or two neighbors who were not related to the family, corroborated appellant. They all testified that they lived in the neighborhood near John B. Atherton and visited his home occasionally and saw appellant there performing such services as testified to by her, and taking them groceries

and clothing, and, according to their evidence, appellee visited his parents occasionally, but, so far as they observed, he did not render them but little assistance.

Dr. F. L. Johnson, who was called by appellant to treat John B. Atherton in August, 1920, just previous to his death, testified that at that time he was suffering from "paralysis, senil dementia, chronic prostatitis, and chronic colitis." But the doctor's testimony related to the condition of the old man in 1920. He knew nothing about his condition previous to that time.

Appellee testified that at the time of the execution of the deed his father was in good health and active physically for a man of his age, and his mental condition was good. According to his evidence, he carefully looked after his parents, furnished them with groceries, clothing, and cared for them in a substantial way. He testified that after he moved to Nuckles he visited his parents once or twice a week to see what care and attention they needed, and during this time his two boys stayed with them at nights and part of the time during the days. He admitted that his parents moved from their home to the home of appellant in March, 1920, and remained there until the death of his father in August following, but he said it was by mutual agreement between his parents, himself, and his sister, the appellant. He said that appellant asked him what he thought about taking their parents to her home, that it would be much easier on him and the boys, inasmuch as they were living close together there at that time. It appears that appellant and appellee at that time were living on adjoining farms in a short distance of each other. He admitted that apellant visited her parents and perhaps rendered them some services, but said it was voluntary on her part and was not made necessary because of any neglect on his part to support and care for them. He testified in detail as to the purchase of groceries, clothing, and other necessities for his parents, naming the stores and places where he purchased them. In reference to his father's health and physical condition from 1914 until 1917, he said that he was active in looking after things about the farm, worked in his tobacco patch, and that he was not paralyzed until 1920 a short time before his death. According to his evidence, his father's physical condition was not such that he needed any personal care and attention in the way of nursing,

dressing, etc. as detailed by appellant and her witnesses. It also appears from the evidence of appellee and a number of other witnesses that Mrs. Atherton, the mother, was in good health and active for a woman of her age, was able to and did do her cooking and the usual housework.

Fred Lyons testified that he married a sister of appellee's first wife in 1908 and up to 1916, the time appellee's wife died, he lived within four miles of them and knew John B. Atherton and his wife and visited his brother-in-law, appellee, frequently, and during the illness of appellee's wife, he (Lyons) stayed with them as much as a week at a time, and in 1915 and 1916, when appellee was living in the home with his father, he saw the old man every time he was there and during these years his health was good and he saw him working in his tobacco patch and he showed no signs of paralysis or other illness, and, so far as he observed, he was in good physical condition for a man of his age, and also his mental condition was good so far as he observed, and his conversations were sensible. He was asked about the condition of the old lady, Mrs. Atherton, and he said, so far as he observed, it was extra good for a person of her age. He was asked if she was up and going about all the time and he answered, "Yes sir, and lots of times pretty fast," and she was doing her cooking and usual household work. He said that during this time he saw appellee come in from Livermore and Nuckles or where-ever he might have been doing his trading, and take things out of his own wagon and take them to his father, such as groceries, and perhaps other things. He said on one occasion in 1916 the old man was talking to him and said that he "and Lander [appellee] had made a fix but did not explain what it was, but that he was looking to Lander to look after him," but made no complaint whatever about the services or things that Lander was doing for him. He said that during the years 1915 and 1916, when he was at the home of appellee and the old people, he never saw the appellant there. In relation to the value of the land deeded to appellee, the witness, Lyons, testified that $300 would have been a big price for it at that time. It appears, however, that about the year 1930, previous to the filing of the suit, an oil boom sprang up in that community and oil was developed on this tract of land, and by reason thereof it became very valuable. There are only 30 acres of the tract of land,

and it appears that it was not very valuable previous to the oil development.

R. L. King, who lived on an adjoining farm to appellee, and a neighbor to John B. Atherton, testified that in 1914, 1915, 1916 he saw the old man frequently, visited him, and had conversations with him, and that he raised tobacco crops across the fence from him, and during these years his health was all right and he raised crops of tobacco each of those years. He stated, however, that the last three years of the old man's life his health was pretty bad. He said that the health of the old woman was pretty good and she was working every time he was there and looking after her husband or helping, and some of appellee's folks were always there when he was there and he saw appellee bring things in for them. He said he saw appellant there occasionally, but he did not see her washing or cooking or doing anything, and it appeared that she was just visiting. He said that he had heard the old folks say that Lander was looking after them, but did not hear them complain about the support he was giving them, and that they always had plenty to eat when he was there and were comfortably dressed. He said that after appellee moved to Nuckles one of his boys stayed with the old folks and made fires and did other work around the house and helped wait on the old man, and appellee was there occasionally and had seen him bring them groceries and things to them. Another witness testified that in conversation with the old woman she said she "didn't know what they would do if it wasn't for Lander," but she made no complaint about the care and services he was rendering them.

Dr. Deweese testified that he was called by appellee to go see his mother and treat her for an injury resulting from a fall, and that he was at their place three times and saw no one there looking after the old people except appellee and his family, and did not see appellant there on any of these visits. The evidence of Marvin Crowe, who also testified for appellee, is in substance about the same as that of appellee and his other witnesses in relation to the old people's health, mental condition, and the care and attention given them by appellee.

W. G. Newton, a practicing attorney at Livermore, Kentucky, testified that John B. Atherton sent for him to come and write the deed in question, and, when the

deed was prepared, appellee was not present, and John B. Atherton dictated the deed and he wrote it in the presence of Mr. Atherton and his wife, and at that time he saw no evidence of any paralytic stroke, and his mind appeared to be good and he knew what he was doing. The two sons of appellee also testified as to the care and services rendered the old folks by their father and that, after they moved to Nuckles, they stayed with their grandparents most of the time, and that their father furnished them groceries and provisions, and up to 1917 their grandfather was able to take care of himself and worked on the farm.

Appellant was asked that, when she took her parents to her home in March, 1920, if she was expecting pay for caring for them, and she said that she was not expecting to charge them but she was expecting appellee to help take care of them. The evidence tends to show that appellee did at the least help take care of his parents while they were at appellant's home. In fact, the preponderance of the evidence shows that he furnished the major portion of their support. No doubt appellant visited her parents and perhaps rendered some help and assistance in looking after them. But this did not entitle her to be subrogated to the benefit of the lien retained in the deed, without a showing that appellee substantially failed to comply with his contract and that she substantially performed the services required of appellee. It will be seen from this resume of the evidence that it is indeed conflicting. It appears that the great majority of appellant's witnesses were members of her family. According to the evidence of a large number of appellee's witnesses who were not related to the family, John B. Atherton's health was good for a man of his age and he did not need, nor was there rendered to him, the nursing, care, and attention claimed by appellant and her witnesses to have been performed by her up to the year 1917. Their evidence is in direct contradiction to that of appellant and her witnesses who testified that Mr. Atherton was paralyzed and in a helpless condition previous to and at the time of the execution of the deed in 1914. We think the preponderance of the evidence is to the effect that he was able to and did take care of himself, worked on his farm, and was in reasonably good health previous to the year 1917, and after that time appellee and his boys stayed with Mr. Atherton the larger portion of their time and also fur-

nished him with the necessities of life. Upon the evidence adduced the chancellor found that appellant had failed to establish her case and dismissed her petition. It is the rule that in equity cases this court will judge and weigh the evidence for itself, and, if it appears that the finding of the chancellor is contrary to the weight and preponderance of the evidence, this court will reverse such finding. But it is also the rule that, where the evidence is conflicting and such as to leave reasonable, prudent minds in doubt as to the truth of it, this court will sustain the finding of the chancellor. La Rue's Committee et al. v. Williams, 211 Ky. 398, 277 S. W. 462; Brewer's Ex'r et al. v. Smith et al., 242 Ky. 175, 45 S. W. (2d) 1036; McIntosh v. Turner, 239 Ky. 495, 39 S. W. (2d) 966.

Many other authorities could be cited, but this rule is too well established and known to require elaborate citation of authority. It appears that the preponderance of the evidence is in favor of appellee, but, the least that be said of the evidence for appellee, it is equally as strong as that produced for appellant upon whom the burden rested to establish her claim. Upon the evidence as a whole we are unable to say that it is insufficient to support the finding of the chancellor.

Wherefore the judgment is affirmed.